COLONIAL PIPELINE COMPANY,           )
                                     )
    Plaintiff,   )
                                     )
v.                                   )
                                     )
JOHN G. MORGAN, TENNESSEE            )
COMPTROLLER OF THE TREASURY;         )
and TENNESSEE STATE BOARD OF         )
EQUALIZATION; and THE MEMBERS        )   No. 3:05-0148
OF THE TENNESSEE STATE BOARD         )   JUDGE ECHOLS
OF EQUALIZATION, INDIVIDUALLY,       )
AS FOLLOWS:                          )
GOVERNOR PHIL BREDESEN,              )
CHAIRMAN; RILEY DARNELL,             )
SECRETARY OF STATE,                  )
VICE-CHAIRMAN; DALE SIMS,            )
STATE TREASURER; LOREN CHUMLEY,      )
COMMISSIONER OF REVENUE; JOHN        )
MORGAN, COMPTROLLER OF THE           )
TREASURY; DOYLE ARP, ASSESSOR        )
OF PROPERTY; and J. M. BAILEY,       )
                                     )
    Defendants.  )

## MEMORANDUM

Pending before the Court are Defendants' Motion to Dismiss (Docket Entry No. 11) for lack of subject matter jurisdiction and Plaintiff's Rule 12(d) Motion In The Alternative (Docket Entry No. 19) to delay ruling on Defendants' Motion until trial. The parties have responded in opposition to the Motions.

Plaintiff Colonial Pipeline Company ("Colonial") brings this action for declaratory and injunctive relief pursuant to the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution; Article I, Section 8, Clause 3 (the Commerce Clause) of the United States Constitution; Article VI, Clause 2 (the

1

Supremacy Clause) of the United States Constitution; 28 U.S.C. §§ 2201 & 2202; and Article I, Section 8 and Article XI, Section 8 of the Tennessee State Constitution. Plaintiff seeks to enjoin permanently: (1) the allegedly unconstitutional application or enforcement of Article II, Section 28 of the Tennessee State Constitution and Tenn. Code Ann. § 67-5-501(9), as amended by Act of May 18, 2004, ch. 719, 2004 Tenn. Laws ("Chapter 719"), which classifies the tangible personal property of Colonial as real property for ad valorem tax purposes; and (2) the allegedly unconstitutional application or enforcement of several provisions in the Tennessee Constitution and statutes in assessing the real property and tangible personal property belonging to Colonial as "Public Utility Property" for ad valorem tax purposes, including Tenn. Const. art. II, § 28, Real Property, subclassification (a); Tenn. Const. art. II, § 28, Tangible Personal Property, subclassification (a); Tenn. Code Ann. § 67-5-501(8)(G); Tenn. Code Ann. § 67-5-502(b); and Tenn. Code Ann. § 67-5-1302(a).

Colonial invokes the Court's jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(3) & (4). The following facts are taken from the verified Complaint For Injunctive and Other Relief. (Docket Entry Nos. 1 & 21 (Verification of John Sapp).)

## I.  FACTS AND PROCEDURAL HISTORY

Colonial is a corporation organized under the laws of the State of Delaware with its principal offices in Alpharetta, Georgia. Colonial is engaged in interstate commerce as a common carrier of refined petroleum products and operates a large diameter

2

refined petroleum pipeline extending from Pasadena, Texas, to Linden, New Jersey (New York Harbor), with stub lines serving parts of Tennessee. The pipeline is a transportation system for all grades of heating oil, diesel fuel, kerosene, jet fuel and gasoline owned by customers of Colonial. The products are injected into the system at eleven (11) origination points and delivered to eighty-five (85) locations along the pipeline. The pipeline is the largest refined petroleum products pipeline in the world and transports in excess of 2 million barrels (or 84 million gallons) of refined petroleum products each day. Colonial has operated the pipeline continuously in the State of Tennessee for more than forty (40) years. Colonial is regulated by the Federal Energy Regulatory Commission ("FERC").

Defendant John G. Morgan is Comptroller of the Treasury for the State of Tennessee. Pursuant to Tenn. Code Ann. §§ 67-5-1301, *et seq.*, he serves as the head of Tennessee's Office of State Assessed Properties ("OSAP"). Also, pursuant to Tenn. Code Ann. § 4-3-5101, Morgan is a member of the State Board of Equalization. Defendant Tennessee State Board of Equalization (the Board") is an agency of the State of Tennessee. Defendant Phil Bredesen is Governor of the State of Tennessee and Chairman of the Board. Defendant Riley Darnell is Secretary of State of the State of Tennessee and Vice-Chairman of the Board. Defendant Dale Sims is State Treasurer of the State of Tennessee, Defendant Loren Chumley is Commissioner of Revenue of the State of Tennessee, and Defendant Doyle Arp is Assessor of Property of the State of Tennessee. All

3

three of them, along with Defendant J.M. Bailey, are Members of the Board.

Colonial's real and personal property is classified and assessed as public utility property in Tennessee pursuant to Tenn. Code Ann. § 67-5-501(8)(G). Public utility property is appraised and centrally assessed by OSAP and not by the local county assessors, pursuant to Tenn. Code Ann. § 67-5-1301(a)(7). In appraising Colonial, OSAP uses the unit method of appraisal, meaning that all of the operating property of Colonial is appraised as a single unit. Tenn. Code Ann. § 67-5-1302. The unit value of Colonial, which traverses thirteen states, is apportioned to Tennessee by a recognized apportionment formula. Tenn. Code Ann. § 67-5-1322. OSAP then applies the public utility assessment percentage of fifty-five percent (55%) to Tennessee's share of Colonial's unit value. OSAP allocates Tennessee's share of Colonial's unit value to the Tennessee counties and municipalities in which Colonial operates based upon the gross investment in those counties and municipalities. Tenn. Code. Ann. § 67-5-1323. The amount to be taxed by each county and city is certified to those jurisdictions by OSAP pursuant to Tenn. Code Ann. § 67-5-1331. (Docket Entry No. 1, Ex. A.) The counties and municipalities issue ad valorem tax bills to Colonial in amounts determined by multiplying the local millage rates by the portion of Colonial operating property allocated to the particular county or municipality.

4

In the 1990's, the airlines and railroads instituted actions in Tennessee federal court against the Board seeking equalization of ad valorem taxes. The litigation resulted in a settlement affording relief to the airlines and railroads by reducing the OSAP assessment of personal property by a factor of fifteen percent (15%). At a hearing held in September 1997, the Board directed OSAP to reduce the Tennessee assessment of the personal property of each centrally assessed taxpayer by fifteen percent (15%). The Board's order was filed on September 30, 1997.

Prior to entry of the order, all public utility operating property in Tennessee was assessed at 55% of its equalized value, whether real property or personal property. Thus, prior to entry of the order, it was irrelevant for property tax purposes whether Tennessee's portion of Colonial's unit value was classified as real property or personal property. By reason of the relief granted, OSAP was obligated to apply a new form of equalization adjustment factor to the personal property portion of Tennessee's share of Colonial's unit value.

On October 9, 1997, Colonial applied to the Board to classify Colonial's operating pipeline property in Tennessee as personal property. OSAP recommended to the Board that substantially all of Colonial's operating pipeline property be classified as real property, thereby substantially depriving Colonial of the equalization relief afforded to personal property by the Board's Order of September 30, 1997. OSAP made a similar decision on the

5

classification applications of the natural gas pipelines traversing Tennessee.

On February 24, 1998, the Board's Assessment Appeals Commission, acting through its Executive Secretary, held a pre-hearing conference with all appealing pipelines, including Colonial. Subsequently, the Board directed that all pipeline classification appeals would be consolidated for discovery and trial and the appeals would be heard initially by an administrative law judge ("ALJ") to be selected by the Board.

The hearing before the ALJ was conducted January 25-27, 1999, and the ALJ filed his Initial Decision and Order on January 14, 2000, upholding the classification of the pipeline operating property as real property. Colonial appealed the decision to the Assessment Appeals Commission. Without opposition from the pipelines, the Assessment Appeals Commission certified the classification question to the Board. The Board scheduled a hearing on the pipelines' exceptions to the Initial Decision on January 31, 2001. After hearing argument, the Board affirmed the Initial Decision. The Board's Final Decision and Order was filed on March 14, 2001. Colonial timely filed a petition for review in the Tennessee Court of Appeals, Middle Section at Nashville on May 11, 2001.

On December 19, 2002, the Tennessee Court of Appeals reversed the Final Decision of the Board, declaring that "the pipelines and surface equipment shall be treated as personal property for purposes of *ad valorem* taxation." <u>ANR Pipeline Co. v. Tennessee</u>

6

<u>Bd. of Equalization</u>, 2002 WL 31840689 at *4 (Tenn. Ct. App. 2002) (unpublished per curiam). On February 14, 2003, the Tennessee Supreme Court denied the Board's Application for Permission to Appeal. The total period that elapsed from the filing of the administrative appeal to the Tennessee Supreme Court's decision was five (5) years and seven (7) months. In July 2003, OSAP followed the classification rules established by the Tennessee Court of Appeals and classified Colonial's pipeline operating property as personal property for 2003.

On February 5, 2004, HB 3289 was introduced in the Tennessee General Assembly. After a series of amendments, HB 3289 was enacted by the legislature and signed into law by the Governor on May 18, 2004 as Chapter 719 of the Public Acts of 2004. (Docket Entry No. 1, Ex. B.) Chapter 719 effectively nullifies the 2002 decision of the Tennessee Court of Appeals by amending Tenn. Code Ann. § 67-5-501(9), and deprives Colonial of the equalization relief afforded to centrally assessed owners of personal property by the Board's Order of September 30, 1997. Colonial alleges that the Defendants, acting jointly and severally and in cooperation with members of the Tennessee General Assembly, achieved the passage of Chapter 719.

Prior to the enactment of Chapter 719, real property and personal property were defined in Tenn. Code Ann. § 67-5-501 according to the common law of fixtures. As amended by Chapter 719, § 67-5-501(9) now reads as follows:

7

(9)(A) "Real property" includes lands, tenements, hereditaments, structures, improvements, movable property assessable under § 67-5-802, or machinery and equipment affixed to realty (except as otherwise provided for in this section) and all rights thereto and interests therein, equitable as well as legal;

(B) Real property includes, but is not limited to, the following:

* * *

(iii) Mains, pipes, pipelines and tanks permitted or authorized to be built, laid, or placed in, upon, or under any public or private street or place for conducting steam, heat, water, oil, electricity or any property, substance or product capable of transportation or conveyance therein or that is protected thereby, excluding propane tanks for residential use[.]

Colonial alleges that Chapter 719 "is but one element in a continuing pattern of discriminatory and unconstitutional conduct on the part of the Defendants, members of the Tennessee General Assembly and their predecessors." (Docket Entry No. 1 at ¶ 46.) Colonial alleges that the effect of Chapter 719 is to deprive it of its right to equalization of the ad valorem taxation of its personal property, and further alleges that the classification of its "[m]ains, pipes, pipelines, and tanks," as real property is "arbitrary, capricious, [and] invidiously discriminatory, and is without a rational relation to any legitimate government interest." (Id. at ¶ 47.) Thus, it violates the Equal Protection Clauses of the United States and Tennessee Constitutions. Because the definition of real property in Chapter 719 was enacted with a discriminatory purpose and/or results in discriminatory ad valorem taxation, Colonial alleges the classification constitutes discrimination against interstate commerce, which results in an

8

undue burden on interstate commerce and is prohibited by the Commerce and Supremacy Clauses of the United States Constitution.

Colonial filed an appeal of its 2004 ad valorem property tax assessment on August 11, 2004. A hearing was held on August 18, 2004. On September 7, 2004, Colonial received a letter from Tom Fleming, Assistant to the Comptroller for Assessments. The letter states in pertinent part:

> The exception filed on behalf of the company . . . raised issues regarding equalization and classification. In accordance with the statement read at the hearing on August 18, 2004, equalization is a function of the State Board of Equalization. The issue of classification is a matter of pending litigation.

(Docket Entry No. 1, Ex. C.) According to Colonial, "[t]he substance of the [letter] is that the State Board deems itself not to be the proper forum for an administrative appeal of the classification issues presented by Chapter 719 (T.C.A. § 67-5-501(9))." (Docket Entry No. 1 at ¶ 51.) Colonial nonetheless, "out of an abundance of caution, . . . filed an Appeal with the State Board on September 14, 2004." (Id.) Colonial alleges that it is unaware of any administrative appeal for centrally assessed taxpayers in Tennessee for ad valorem tax purposes which does not involve the Board. "The substance of the letter from Mr. Fleming . . . and the fact no hearing has been scheduled as of the date of filing of this Complaint, shows that Colonial has no plain, adequate, or complete remedy at law to redress the wrongs complained of . . . apart from the filing of this action." (Id. at ¶ 53.)

9

Colonial also claims that Tennessee's assessment percentages violate the Equal Protection Clauses of the United States and Tennessee Constitutions and the Commerce and Supremacy Clauses of the United States Constitution. Colonial alleges that Tennessee assesses Colonial's operating real and personal property at the higher public utility assessment rate of 55%, while the real and personal property of other transportation companies are assessed at the lower commercial and industrial assessment rates of 40% of value for real property and 30% of value for personal property. Colonial claims the rationale and governmental interest justifying such a disparity in assessment no longer exists. Colonial is no longer rate-based regulated, it has no monopoly or other Tennessee franchise, and it is no different from any other transportation business. Colonial further claims the current business and regulatory environment of refined petroleum pipelines is totally different from the business and regulatory environment that existed in 1972 when the Tennessee Constitution was amended by the adoption of Article II, Section 28, Real Property, Subclassification (a), and Article II, Section 28, Tangible Personal Property, Subclassification (a). In 1972, Colonial was a rate-based regulated carrier with a guaranteed rate of return. It is no longer a rate-based utility, and it is no longer guaranteed a rate of return on its investment. Under the current regulatory indexing system, which sets the levels for changes in tariff rates charged to customers for the transport of refined petroleum products,

Colonial has no way to "pass through" to customers the ad valorem taxes paid on its operating property.

Colonial alleges that motor carriers generally escape discrimination by the States by reason of 49 U.S.C. § 14502.[1] Even though Colonial's pipeline system performs transportation and delivery services similar to the airplanes and trucks of Federal Express and United Parcel Service, all of Colonial's property is assessed at 55%, while the property of motor carriers is assessed at 40% for real property and 30% for personal property.

Similarly, according to Colonial, its pipeline system performs transportation and delivery services almost identical to the gasoline trucks that transport product from Colonial's distribution points to the local service stations. Colonial delivers approximately 80% of the refined petroleum products consumed in the Nashville area. But every barrel Colonial delivers into the Nashville area, except the jet fuel supplied to the Nashville airport, must be redelivered by truck. The trucks delivering petroleum products in Nashville delivered by Colonial are assessed at 30% while Colonial's operating pipeline is assessed at 55%. Colonial asserts it is no different from any other transportation company and should be treated the same for property tax purposes.

---

[1]This statute provides, among other things, that, to avoid an unreasonable burden on interstate commerce, a State or one of its subdivisions may not levy or collect an ad valorem property tax on motor carrier transportation property at a tax rate exceeding the tax rate applicable to commercial and industrial property in the same assessment jurisdiction.

11

Colonial claims it is different from the natural gas pipeline companies and electric utilities because their competition is other natural gas pipeline companies and electric utilities. Transportation companies do not transport natural gas or electricity.

Colonial alleges that it is required to use the same General Accepted Accounting Practices ("GAAP") as every other non-regulated business, and unlike the properties of motor carriers, barge companies, and railroads, Colonial's pipeline operations do not generate demands for appreciable services from the State of Tennessee or its political subdivisions. Moreover, public safety is enhanced by its operations.

Colonial seeks the following relief: (1) a declaration that the 2004 amendments to Tenn. Code Ann. § 67-5-501(9) are unconstitutional and unenforceable by reason of the Equal Protection, Commerce and Supremacy Clauses of the United States Constitution; (2) a declaration that the provisions of Tennessee Constitution Article II, Section 28, Real Property, Subclassification (a) is unconstitutional and unenforceable by reason of the Equal Protection, Commerce and Supremacy Clauses of the United States Constitution to the extent that it or its statutory counterparts imposes an assessment rate upon Colonial's operating real property in excess of 40%; (3) a declaration that the provisions of Tennessee Constitution Article II, Section 28, Real Property, Subclassification (a) is unconstitutional and unenforceable by reason of the Equal Protection, Commerce and

12

Supremacy Clauses of the United States Constitution to the extent it or its statutory counterparts impose an assessment rate upon Colonial's operating personal property in excess of 30%; (4) a permanent injunction enjoining Defendants and all of those acting in concert with them, from classifying Colonial's properties other than as provided in the 2002 decision of the Tennessee Court of Appeals and from assessing Colonial's property in excess of 40% as to real property and 30% as to personal property; and (5) reasonable attorney's fees, costs and other relief.

## A. Motion to Dismiss

Defendants now move to dismiss the Complaint for lack of subject matter jurisdiction. Defendants contend the Tax Injunction Act, 28 U.S.C. § 1341, and the principle of comity embodied in the statute bar Colonial from bringing its claims in this Court. Defendants further contend that Colonial has a plain, speedy and efficient remedy before the Board and in the Tennessee courts.

In support of the Motion to Dismiss, Defendants provide the Affidavit of Kelsie Jones, Executive Secretary of the Board, who attests that he is acting as administrative judge to hear Colonial's exceptions to the 2004 assessment filed with the Board. (Docket Entry No. 13 at ¶ 3.) Jones convened a status conference with counsel for Colonial and OSAP on September 28, 2004, to discuss and schedule preparations and hearings. Jones attests the discussion was continued to accommodate Colonial's desire to explore resolution of its assessment classification issues before the Tennessee Tax Study Commission and the Tennessee General

13

Assembly before the hearing or prehearing conference on Colonial's exceptions resumed. Jones further attests that Colonial has not communicated further with him regarding this appeal since the date of the first conference. Nonetheless, Colonial's challenge to its 2004 assessment, which raises Colonial's objections to classification of its property as real property under Chapter 719, is still a pending matter before the Board. (<u>Id.</u> at ¶ 4.) Jones denies that the Board is currently involved in litigation in which it has taken a position in conflict with Colonial's position as stated in the Complaint, nor was the Board involved in such litigation in September 2004. (<u>Id.</u> at ¶ 5.) Jones also attests that he is familiar with the administrative proceedings that led to the Tennessee Court of Appeals' decision in 2002. He states the classification appeals involved three groups of pipeline companies, two counties were permitted to intervene, the case was complex and involved multiple parties, and most of the elapsed time was due to the preparation of the parties. To his knowledge, the record does not contain any complaints of delay. (<u>Id.</u> at ¶ 6.)

Defendants also provide the Affidavit of Tom Fleming, Assistant to the Tennessee Comptroller of the Treasury for Assessments. He is the appointed designee of Defendant John Morgan concerning appeals for the assessment of public utility companies. Tenn. Code Ann. § 67-5-1327. He determines assessments, notifies taxpayers, and certifies assessments to the Board. By letter dated June 21, 2004, Defendant Morgan appointed Fleming to serve as his

14

designee concerning assessments of public utility companies. (Docket Entry No. 14, Fleming Aff. at ¶¶ 1-2.)

Fleming states he signed and mailed the September 7, 2004 letter to Colonial. (Docket Entry No. 1, Ex. C.) He customarily sends a similarly worded, generic letter to any public utility company that requests the Comptroller review its property assessment. The purpose of the letter is to remind public utilities of the applicable procedure to be followed. Fleming attests that the statement in the letter referring to "'pending litigation' does not in fact apply to Colonial Pipeline. Any suggestion that this statement refers to Colonial Pipeline or the issues in Colonial Pipeline's appeal of its assessment was unintended." (Id. at ¶ 3.) Fleming further attests that nothing in the letter was intended to indicate that the Board was unable or unwilling to entertain Colonial's appeal of the 2004 assessment. (Id.) Fleming states he does not represent the Board and he is not authorized to speak for the Board. (Id. at ¶ 4.)

In opposition to the Motion to Dismiss, Colonial provides the Affidavit of John Sapp, an attorney who has represented Colonial in ad valorem tax administration in numerous states for the past fifteen years. (Docket Entry No. 24, Sapp Aff.) He attests that, contrary to the affidavit of Kelsie Jones, Colonial has no knowledge that the Board referred Colonial's 2004 exceptions for an initial hearing before an administrative judge. As of the last meeting in September 2004, Colonial was unaware that Kelsie Jones was acting as administrative judge, but knew only that Jones had

15

posed the question to Colonial as to his possible service as the hearing officer. In the same meeting, Jones proposed a hearing during February 2005, but the meeting ended to allow Colonial to explore resolution before the Tennessee Tax Structure Study Commission and the Tennessee General Assembly. (Id. at ¶ 22.)

Sapp further attests that Colonial has not communicated with Jones regarding the appeal since September "because the facts and circumstances characterizing the conduct of the Defendants since September 30, 1997, show that the Defendants are still pursuing a pattern of activity designed to deny personal property tax equalization relief to the pipelines." (Id. at ¶ 23.) He states that the taped transcripts of the legislative committee hearings show that the individual Defendants, who are members of the Board, acted in concert with members of the Tennessee General Assembly and actively pursued legislation in the 2004 session that culminated in the passage of Chapter 719, the contents of which directly conflict with Colonial's position. (Id. at ¶ 24.) He further attests that Fleming's September 7, 2004 letter communicated to Colonial that the Board would not be deciding classification of property issues in an administrative appeal and led Colonial to reconsider whether the remedy of an appeal to the Board would be plain, speedy and efficient. (Id. at ¶ 28.)

Sapp attests that Colonial has also become aware of information that will make certain Defendants witnesses to the facts underlying Colonial's claims. Defendant Comptroller Morgan introduced the bill that culminated in Chapter 719 to the House

16

Finance, Ways and Means Committee.  Members of his staff and members of the Board made appearances at legislative hearings on Chapter 719.  Defendant Governor Bredesen, a member of the Board, signed Chapter 719 into effect on May 18, 2004.  (<u>Id.</u> at ¶¶ 29-31.)  Colonial has also been made aware of public pronouncements regarding Chapter 719 by the Executive Secretary of the Board, Kelsie Jones, and by Tom Fleming, the Defendant Comptroller's appointed designee.  (<u>Id.</u> at ¶ 32.)

Sapp states that, except for ad valorem tax year 1997, Colonial has not withheld the payment of taxes from the local governments, but has paid its ad valorem taxes, including for 2004, to the local governments in full under protest, including the disputed portion which had been withheld for 1997.  The relief accorded to Colonial by the decision of the Tennessee Court of Appeals was mostly recouped through tax credits against the taxes due to the local governments for ad valorem tax year 2003, but in limited instances some jurisdictions elected to issue checks for refunds.  (<u>Id.</u> at ¶ 33.)

**B.  Rule 12(d) Motion in the Alternative**

Colonial has filed a Rule 12(d) Motion in the Alternative, asking for an opportunity to discover facts that would support its allegations of federal jurisdiction.  (Docket Entry No. 19.)  Colonial claims that the unsuitability of the Board to conduct an administrative hearing to determine the merits of the issues stated in its Complaint is, if not a question of law to be decided in favor of the Plaintiff, a mixed question of law and fact that

17

requires discovery, trial and findings of fact, relying on <u>Colonial Pipeline Co. v. Collins</u>, 921 F.2d 1237, 1244 (11th Cir. 1991) ("Although a district court has wide discretion to determine the scope of such discovery, a plaintiff must have ample opportunity to present evidence bearing on the existence of jurisdiction.") Colonial gives four reasons why it should be allowed to postpone ruling on the jurisdictional question until trial in this Court.

First, three of the seven members of the Board are members of the executive branch of Tennessee government, and three of the four remaining members have executive functions, but are elected by the Tennessee General Assembly. Five of the seven members have revenue projection and collection responsibilities to the State and its political subdivisions. Second, the Board, having granted 15% personal property equalization relief to centrally assessed taxpayers in 1997 has since that date worked in conjunction with the Comptroller to deny such equalization, even after the Tennessee Court of Appeals reversed the Board's prior decision.

Third, members of the Board, its Executive Secretary, and the staffs of Board members are material witnesses to the events underlying the property classification policies of the Board. When those policies were ruled illegal, the Board's members and their staffs achieved the enactment of Chapter 719. Fourth, the hearing officer appointed by the Board for Colonial's administrative appeal from its 2004 assessment is Kelsie Jones, the Executive Secretary of the Board. He is also a witness to the policies of the Board and the surrounding events.

18

Defendants respond that the question of subject matter jurisdiction should be resolved at the earliest possible time. Further, Defendants contend the Court is not required to hold an evidentiary hearing to determine that Colonial has a plain, speedy and efficient state remedy to challenge its 2004 assessment and raise its classification issues and that the Tax Injunction Act bars this suit. Defendants provide the Affidavit of Peter Loesch (Docket Entry No. 38), who avers that effective November 1, 2003, he and two other persons employed by the Board as administrative judges were transferred from the Comptroller's Office to the Secretary of State's Office pursuant to a Memorandum of Understanding signed by Defendant Comptroller Morgan and Defendant Secretary of State Darnell. (Id., Ex. A.) According to the Memorandum, the transferred positions are subject to appointment, supervision, discipline and discharge by the Secretary of State and are no longer considered part of the Comptroller's Office or the Board. He further avers that he and the other two administrative judges have continuously served pursuant to the terms of the Memorandum since November 1, 2003. (Id. at ¶¶ 3-4.)

## II.   **STANDARD OF REVIEW**

Federal Rule of Civil Procedure 12(b)(1) permits a district court to dismiss a case for lack of jurisdiction over the subject matter. When a defendant challenges subject matter jurisdiction through a motion to dismiss, the plaintiff bears the burden to establish jurisdiction. Hedgepeth v. Tennessee, 215 F.3d 608, 611 (6th Cir. 2000). Rule 12(d) provides:

19

**Preliminary Hearings.** The defenses specifically enumerated (1)-(7) in subdivision (b) of this rule, whether made in a pleading or by motion . . . shall be heard and determined before trial on application of any party, unless the court orders that the hearing and determination thereof be deferred until the trial.

"Rule 12(d) contemplates that a trial court entertaining a motion for dismissal under Fed.R.Civ.P. 12(b), and having before it the opponent's application for a hearing on the motion, will do one of two things: defer the motion to trial or hold a preliminary hearing on it." Commodities Export Co. v. U.S. Customs Serv., 888 F.2d 431, 436 (6th Cir. 1989). The standard to be used in deciding if a hearing is required "is equivalent to that used under Fed.R. Civ.P 56(c), in ruling on a motion for summary judgment; that is, where genuine issues of material fact exist, they must be submitted to decision on the evidence." Id. Only where the facts are relatively simple and substantially undisputed and the law is not complex may the district court decide a Rule 12(b)(1) motion without making findings on disputed questions of fact. Id.

### III. APPLICABLE LAW AND ANALYSIS

**A. Colonial's Rule 12(d) Motion**

The four grounds provided by Colonial in its Rule 12(d) Motion do not compel the Court to hold an evidentiary hearing. The first stated ground for delay in ruling on the jurisdictional question-- that the individual Defendants hold positions in the Executive Branch--does not disclose any reason why discovery of additional facts is necessary before the Court may rule. As to the second and third grounds, the Court assumes in Colonial's favor that the Board

20

has worked since 1997 in conjunction with the Comptroller to deny equalization to centrally assessed taxpayers and that members of the Board, the Executive Secretary, and the Board staff are material witnesses to the events underlying the property classification policies of the Board. Again, neither of these grounds explains why the development of additional facts is necessary before the Court rules. Finally, as to Colonial's fourth ground, the Court recognizes that Kelsie Jones, the Executive Secretary of the Board, is the hearing officer appointed by the Board to decide Colonial's 2004 administrative appeal and that he is a witness to the policies of the Board and surrounding events.

Nonetheless, the facts presented to the Court, while lengthy, are relatively simple and substantially undisputed. The only material factual dispute appears to concern the meaning of Tom Fleming's September 7, 2004 letter. Taking the Fleming letter and the other facts in the light most favorable to Colonial, as the Court would ordinarily do on a motion for summary judgment, the Court finds there are no genuine issues of material fact that require a preliminary hearing or trial before the Court may rule on Defendants' Motion to Dismiss under Rule 12(b)(1).

The parties disagree solely on the application of law to undisputed facts. Each party arrives at a different conclusion when considering whether Colonial has a plain, speedy and efficient remedy to challenge its 2004 assessment and to raise its constitutional claims concerning property classification. The resolution of the question dictates whether the Tax Injunction Act

bars this suit. For the reasons stated below, the Court determines as a matter of law that Colonial does have a plain, speedy and efficient remedy and that the Tax Injunction Act bars this suit. Accordingly, Plaintiff's Rule 12(d) Motion in the Alternative (Docket Entry No. 19) will be DENIED.

## B. Application of the Tax Injunction Act

The Tax Injunction Act of 1937, 28 U.S.C. § 1341, provides:

> The district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State.

"The overall purpose of the Tax Injunction Act is consistent with the view that the 'plain, speedy and efficient remedy' exception to the Act's prohibition was only designed to require that the state remedy satisfy certain procedural criteria[.]" Rosewell v. LaSalle Nat'l Bank, 450 U.S. 503, 522 (1981). The statute has roots in equity practice, the principles of federalism, and the States' imperative need to administer their own fiscal operations. Id. "This last consideration was the principal motivating force behind the Act: this legislation was first and foremost a vehicle to limit drastically federal district court jurisdiction to interfere with so important a local concern as the collection of taxes." Id.

Congress intended to curtail federal jurisdiction to entertain tax injunction suits because allowing such suits to go forward permitted taxpayers, especially foreign corporations, to withhold the payment of taxes from a State and its subdivisions "'in such

22

vast amounts and for such long periods as to disrupt State and county finances, and thus make it possible for such corporations to determine for themselves the amount of taxes they will pay.'" <u>Id.</u> at 526 (quoted legislative history omitted); <u>Hibbs v. Winn</u>, 542 U.S. 88, 159 L.Ed.2d 172, 187 (2004). The reasons supporting federal non-interference in state tax issues are just as compelling now as in 1937, for

> [i]f federal injunctive relief were available,

>> "state tax administration might be thrown into disarray, and taxpayers might escape the ordinary procedural requirements imposed by state law. During the pendency of the federal suit the collection of revenue under the challenged law might be obstructed, with consequent damage to the State's budget, and perhaps a shift to the State of the risk of taxpayer insolvency. Moreover, federal constitutional issues are likely to turn on questions of state tax law, which, like issues of state regulatory law, are more properly heard in the state courts."

<u>Rosewell</u>, 450 U.S. at 527 (quoted opinion omitted). Because Congress intended to prevent federal court interference with the assessment and collection of state taxes, the Act prohibits declaratory as well as injunctive relief. <u>California v. Grace Brethren Church</u>, 457 U.S. 393, 411 (1982); <u>King v. Sloane</u>, 545 F.2d 7, 8 (6th Cir. 1976). A taxpayer's intentional bypass of state remedies is exactly what the Tax Injunction Act "was designed to ward off[,]" <u>Hibbs</u>, 159 L.Ed.2d at 188, and the Act bars federal subject matter jurisdiction where taxpayers pursue federal litigation to avoid paying state taxes or to gain a refund of state taxes. <u>Id.</u> at 189.

23

A district court may exercise federal jurisdiction if the taxpayer does not have "a plain, speedy or efficient remedy" in the state courts. The Court must construe the exception narrowly, Grace Brethren Church, 457 U.S. at 413, and the phrase must be given a procedural interpretation. Rosewell, 450 U.S. at 516. That is, to satisfy the Tax Injunction Act, the state remedy must provide the taxpayer with "a full hearing and judicial determination" at which the taxpayer may raise all constitutional objections to the tax. Id. at 514.

While "plain" means "clear" or "manifest," uncertainty concerning a state remedy may make it less than "plain" and may lift the bar to federal court jurisdiction. Id. at 517. "Speedy" is a relative concept. Id. at 518. A two-year state administrative delay, as compared to a longer period ordinarily required for federal litigation (at least when Rosewell was decided in 1981), does not fall outside the boundary of a "speedy" remedy. Id. at 521. A remedy is "efficient" if it does not impose a hardship on the taxpayer or if it does not require a multiplicity of suits. Id. at 517-518.

Colonial contends the Tax Injunction Act does not apply to bar this suit because Colonial does not have a plain, speedy and efficient remedy to challenge Chapter 719, its 2004 ad valorem property tax assessment, and the disparities that exist in tax assessments of transportation pipelines as compared to other common carriers. Colonial relies on Northwest Airlines, Inc. v. Tennessee State Bd. of Equalization, 11 F.3d 70 (6th Cir. 1993), in which the

24

Sixth Circuit held the Tax Injunction Act did not bar federal court jurisdiction to consider Tennessee's method of taxing air carrier property physically located in Tennessee.

In that case, the Sixth Circuit certified four questions to the Tennessee Supreme Court. The first two questions were:

> 1. Does Tennessee provide any forum to the air carriers other than a hearing before the State Board of Equalization, provided by Tennessee Code Annotated § 67-5-1328, with review of its decision by a petition to review to the Middle Division of the Court of Appeals under Tennessee Code Annotated § 4-5-322(b)(1)?
>
> 2. As an alternative to the review provided by Tennessee Code Annotated § 4-5-322(b)(1), does Tennessee law authorize the airlines to pay the tax under protest and sue for a refund in circuit court?

Id. at 71. The Tennessee Supreme Court answered "No" to both questions, rendering the two remaining questions moot. Id.; Northwest Airlines v. Tennessee State Bd. of Equalization, 861 S.W.2d 232, 236 (Tenn. 1993). The Sixth Circuit observed that Tennessee's procedure permits the Board of Equalization to serve as the finder of fact in adjudicating filed claims and that appellate court proceedings are confined to the record generated by the Board. Northwest Airlines, Inc., 11 F.3d at 72. The appellate court is permitted to "reverse or modify the [Board's] decision if the rights of the petitioner have been prejudiced because the administrative findings, inferences, conclusions, or decisions are: (1) In violation of constitutional or statutory provisions . . . or (5) Unsupported by evidence which is both substantial and material in light of the record." Id. (quoting Tenn. Code Ann. § 4-5-322(h)). Moreover, the Sixth Circuit noted, in determining the

25

substantial nature of the evidence, the Tennessee appellate court "shall take into account whatever in the record fairly detracts from its weight, but the court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact." Id.

The air carriers contended that Tennessee's review procedure did not provide them with a "plain, speedy and efficient remedy" because the Board could not "make an unbiased factual determination of the assessment level of personal property in Tennessee." Id. The carriers pointed out

> that the Board, as a defendant in unrelated, pending federal litigation, [had] already taken a position adverse to them with respect to this determination. [footnote omitted] Accordingly, they assert that because the Board has prejudged their claims, and the Tennessee Court of Appeals is precluded by statute from meaningful review of the Board's factual determinations, the Tax Injunction Act does not bar the air carriers' action in the district court.

Id. The Sixth Circuit did not accept all of this argument. Following Rosewell closely, the Sixth Circuit acknowledged the "plain, speedy and efficient" exception requires a state remedy that meets certain minimal procedural criteria, but emphasized district court jurisdiction cannot be grounded on the substantive inadequacy of the state court remedy. Id. at 72-73. The court nonetheless determined "that the peculiar facts of the instant case present a rare exception to the general rule." Id. at 73. Because the Board was the sole factfinder in the state review process for the air carriers' federal claim, because the Board was precluded by its position in pending federal litigation from crediting the

carriers' evidence in support of their claim, and because the Tennessee Court of Appeals was precluded from effectively reviewing the Board's factual determinations under § 4-5-322(h)(5), the Sixth Circuit held the air carriers' federal rights were not adequately protected in that a full judicial hearing of their claims was not available.  Id.  Accordingly, the Sixth Circuit held the air carriers did not have a "plain, speedy and efficient remedy" and the Tax Injunction Act did not bar their federal suit.  Id.

Similarly, Colonial argues it does not have a "plain, speedy and efficient remedy," because the Board has prejudged its claims, as evidenced by the Board's activity in achieving the passage of Chapter 719, and because Fleming's letter shows the Board deems itself not to be the proper forum for an administrative appeal of the classification issues.  Thus, for the same reasons stated in Northwest Airlines, Colonial claims the Tax Injunction Act does not bar this federal suit.

A "'fair trial in a fair tribunal is a basic requirement of due process.'"  Withrow v. Larkin, 421 U.S. 35, 46 (1975) (quoted case omitted).  But an agency's support of a public position on a policy issue does not disqualify the agency on the ground of bias from later acting in its adjudicative role.  See id.; FTC v. Cement Institute, 333 U.S. 683, 702 (1948) (ruling that members' prior expression of opinions on matter before FTC did not necessarily mean the minds of the members were irrevocably closed); United States v. Morgan, 313 U.S. 409, 421 (1941).

27

Moreover, the "peculiar facts" of <u>Northwest Airlines</u>, leading to a "rare exception to the general rule," are not present in this case. Despite the reference in Fleming's letter that "the issue of classification is a matter of pending litigation[,]" Colonial has produced no evidence to establish the Board is even involved in pending litigation on classification issues of interest to Colonial, let alone that the Board has taken a position in such litigation contrary to Colonial's view.[2] While the Board members' involvement in the passage of Chapter 719 certainly indicates their support of a *change in the law*, their involvement does not indicate any prejudgment of the *facts* of Colonial's specific tax case.

A critical segment of the Tennessee Supreme Court's opinion in <u>Northwest Airlines</u> was not discussed by the Sixth Circuit when it reviewed the Tennessee Supreme Court's responses to the four certified questions. The Tennessee Supreme Court stated: "While the choice of methods for contesting the validity of taxes that are assessed pursuant to T.C.A. § 67-5-1301, et seq. is extremely limited, a wide variety of types of objections may be raised. These include objections based on *federal and state constitutional provisions, statutes and case law*." <u>Northwest Airlines, Inc.</u>, 861 S.W.2d at 236 (emphasis added). <u>See</u> <u>also</u> <u>Richardson v. Tennessee Bd. of Dentistry</u>, 913 S.W.2d 446, 456-457 (Tenn. 1995) (holding party in contested case may raise facial constitutional challenges

_____

[2]Defendants produced evidence the Board is not involved in any such litigation and Colonial did not generate a genuine issue of material fact on this point.

28

on judicial review and "as applied" constitutional challenges before the agency and the courts). Thus, Tennessee's highest court recognized that a common carrier wishing to challenge its tax assessment may raise federal and state constitutional objections in seeking review before the Board and before the Tennessee Court of Appeals in the event of an unfavorable decision by the Board. See also Wilson v. Bredesen, 113 Fed. Appx. 70, 71, 2004 WL 2203552 at **1 (6th Cir. 2004) ("Proving that the Tennessee legal system permits challenges to unconstitutional taxes, other litigants have challenged the very statute Wilson seeks to invalidate here.") The Sixth Circuit itself realizes that, while Tennessee places limits on judicial review of agency decisions, "these unexceptional features of Tennessee administrative law do not establish that the State fails to provide a plain, speedy and efficient remedy for tax challenges." Id., 113 Fed. Appx. at 73-74, 2004 WL 2203552 at **3. A reviewing court in Tennessee need not defer to administrative findings that are not supported by the record, and a reviewing court subjects an agency's determination of constitutional questions to de novo review. Id.

The Tennessee Court of Appeals previously demonstrated that it can and will consider Colonial's constitutional claims because it ruled in favor of Colonial and other pipelines in reversing the Board's property classification decision in 2002. See ANR Pipeline Co., 2002 WL 31840689 at *4. Thus, Colonial is hard-pressed to show in this instance that the state remedy available will be futile if pursued. Cf. Colonial Pipeline Company v. Collins, 921

29

F.2d 1237 (11th Cir. 1991) (remanding for further discovery on adequacy of available state remedy where Georgia Board of Equalization was severely understaffed and backlogged, statutory property tax appeal process was cumbersome, and doubt existed whether Colonial had a certain state remedy). Moreover, if unsuccessful in the Tennessee Court of Appeals, Colonial may seek further review in the Tennessee Supreme Court and the United States Supreme Court. A "full hearing and judicial determination" at which the taxpayer may raise constitutional objections to the tax is all that the Tax Injunction Act requires to bar federal jurisdiction, Rosewell, 450 U.S. at 514, and Tennessee's due process procedure affords full protection to Colonial's federal rights. See Hillsborough v. Cromwell, 326 U.S. 620, 625 (1946).

The Tennessee remedy Colonial may pursue is "plain" and "efficient" as those terms are defined by Rosewell. Id. at 518. Whether the remedy is "speedy" is a closer question. Colonial's last involvement with the state review process took more than five years from start to finish, but the undisputed record reflects multiple parties were involved in a complex administrative proceeding. Colonial began the state review process again in September 2004, but has allowed the administrative matter to languish while it pursued relief before the Tennessee Tax Study Commission, the Tennessee General Assembly, and in this federal court. Defendants produced evidence that the matter remains pending on the State's administrative proceeding calendar. The

Court concludes under the circumstances that Colonial has a speedy state remedy at its disposal.

Colonial relies on Garrett v. Bamford, 538 F.2d 63 (3rd Cir. 1976), to argue that the Tax Injunction Act does not bar this suit because Colonial challenges the method of classification and does not seek to enjoin, suspend or restrain the assessment or levy or collection of any tax under Tennessee law. Garrett is different from this case because plaintiffs in that suit sought an injunction requiring defendants to cause immediately the assessment of all residential property within the county in a non-racially discriminatory basis and to make an annual property tax assessments. Id. at 65-66. Here, Tennessee has made the 2004 ad valorem tax assessment and the taxing bodies have collected Colonial's assessed taxes. While Colonial seeks to challenge the method of classification and collection, Colonial's ultimate goal is to lower its tax bill. Such an ambition requires a direct challenge to the levy and collection of taxes, which is barred by the Tax Injunction Act.

The principle of comity further supports the Court's conclusion that Colonial should pursue the state, rather than a federal, remedy. See Fair Assessment in Real Estate Assn., Inc. v. McNary, 454 U.S. 100, 116 (1981); In re Gillis, 836 F.2d 1001, 1005-1009 (6th Cir. 1988).

## IV. CONCLUSION

For all of these reasons, the Court concludes that Colonial Pipeline Company has a plain, speedy and efficient remedy in

31

Tennessee state court. The Tax Injunction Act applies to preclude this Court from exercising federal subject matter jurisdiction to entertain Colonial's constitutional challenges to the ad valorem property tax classification and assessment. Accordingly, Defendants' Motion to Dismiss (Docket Entry No. 11) for lack of subject matter jurisdiction shall be GRANTED and this case shall be DISMISSED WITHOUT PREJUDICE.

IT IS SO ORDERED.

ROBERT L. ECHOLS
UNITED STATES DISTRICT JUDGE